UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:09-00090 |
| | ) | JUDGE CAMPBELL |
| TELLIS T. WILLIAMS | ) | |

MEMORANDUM AND ORDER

I. Introduction

The Court held an evidentiary hearing in this case on September 4, 8, 9, 21, 22, and 23, 2009 regarding the Defendant's conditions of confinement at the Robertson County Detention Facility ("RCDF" or "Jail"). The parties have each filed post-hearing briefs and reply briefs. (Docket Nos. 90, 91, 92, 93).

In his post-hearing brief, the Defendant requests that the Court order that he be moved to another facility or released on bond. (Docket No. 90-1). Alternatively, Defendant requests that the Court order the United States Marshals Service to act to ensure that the Defendant and other pretrial detainees are not being treated punitively and inhumanely while held in the custody of the federal government and order an investigation into the Robertson County Jail conditions. (Id.)

For the reasons set forth herein, the Court orders the United States Marshals Service to move the Defendant forthwith to another facility during the pendency of this case.

II. Procedural Background

The Defendant first complained of his conditions of confinement at the RCDF in a letter to the Court dated July 30, 2009 (Docket No. 20), which was filed and served on counsel for the

Government and the Defendant. The Court held a status conference regarding the letter on August 21, 2009, during which the Defendant requested an evidentiary hearing. (Docket No. 23). The Court consulted the parties regarding scheduling and entered an Order setting the evidentiary hearing for September 4, 2009. (Docket No. 24). Prior to the hearing, the Court entered an order addressing the scope of the allegations and the remedy to be considered at the hearing:

> The scope of the allegations the Court will consider at the evidentiary hearing will be limited to those allegations that have affected Defendant Williams personally, identified in his brief as inadequate nutrition, hygiene, and medical care. Corroborating testimony about general practices that relate to these issues will be considered as relevant in determining whether the Defendant has carried his burden of proving these issues. The testimony will also be considered as relevant to the credibility of the parties' claims and defenses and impeachment.
>
> As for the scope of the remedies requested by the Defendant in his brief (Docket No. 41, p. 5), the Court notes that a decision about whether to order a remedy and, if so, what remedy, is yet to be decided. However, for purposes of the hearing, the Court will consider the request to produce the Defendant's records and documents; the request to release the Defendant from pretrial confinement; and the request to order any other relief that the Court deems just and proper, including the transfer of the Defendant to another facility. The other requested remedies are for another forum. The Court notes that this hearing would be unnecessary if the Defendant were transferred to another facility.

(Order, at 2, 3 (Docket No. 52)).

In that Order, the Court also addressed the Government's contention that the conditions of Defendant's confinement were not relevant in this criminal case:

> As for the Government's next contention, the Court finds that the conditions of the Defendant's confinement are relevant in this criminal case because those conditions can impede his ability to assist in his defense. The conditions can also affect his ability to make a knowing, intelligent and voluntary decision to go to trial or enter a guilty plea. Harsh conditions can become a coercive force in the Defendant's decision about whether to accept particular plea offers or to cooperate in an effort to obtain a 5K motion from the Government. Finally, the Court has the inherent power to supervise the conditions of the

2

pretrial detention it has ordered.

(Id., at 2).[1]

As stated above, the Court has the authority under the Bail Reform Act, 18 U.S.C. § 3141, et seq., to make decisions regarding the detention or release of individuals awaiting trial and/or imposition or execution of sentence. See also 28 U.S.C. § 1651; 28 U.S.C. § 1361. The Court's decision, however, is informed by, though not controlled by, the standards set forth by the federal courts in civil cases brought by state and federal inmates raising constitutional challenges to conditions of confinement. See, e.g., Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)(Standards used to evaluate challenges by pretrial detainees to conditions of confinement based on Fifth Amendment Due Process Clause); Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)(Standards used to evaluate challenges by convicted prisoners to conditions of confinement based on Eighth Amendment Cruel and Unusual Punishment Clause).

### III. Analysis

As noted above, the Defendant alleges that the conditions at RCDF result in a lack of adequate nutrition, adequate medical care, and adequate hygiene. Defendant also challenges the RCDF's failure to permit inmates to go outside the facility at any time other than for transportation.[2] Because the Court concludes that the RCDF's failure to provide adequate

---

[1] Prior to the completion of the evidentiary hearing, the Defendant entered a plea of guilty to the charge in the Indictment. (Docket Nos. 79, 80). The Defendant's conditions of confinement remain relevant to the Defendant's sentencing and the sentencing factors in 18 U.S.C. § 3553.

[2] It is undisputed that inmates at RCDF are not allowed to go outside at any time except as required to travel to court proceedings. This is of continuing concern to the Court.

3

nutrition necessitates the transfer of the Defendant, it is unnecessary to address the other allegations raised by the Defendant.

It is well settled and clearly established that inmates are constitutionally entitled to adequate food and nutrition. See, e.g., Farmer, 114 S.Ct. at 1976; Foster v. Runnels, 554 F.3d 807, 815 (9th Cir. 2009). Based on the evidence adduced at the hearing, the Court is persuaded that adequate food and nutrition has not been provided to Defendant Williams at the RCDF.

The testimony adduced at the hearing indicates that RCDF serves three meals to inmates between the hours of 4:30 or 5:00 a.m. and 4:30 or 5:00 p.m. (Transcript of Hearing, at 21, 880-81 (Docket Nos. 68, 76, 77, 87, 88, 89) (hereinafter "Tr.")). The food service for the Jail is provided through a contract with ABL Management Company located in Baton Rouge, Louisiana. (Tr. at 766-67). There is no commissary at RCDF, which would provide inmates with the opportunity to purchase food in addition to that provided by the Jail. (Tr. at 1003). Thus, all food and nutrition must be provided by the Jail. According to the ABL contract, the price per meal per inmate for an inmate population of 200-250 inmates, like that of the RCDF, is $1.2455. (Docket No. 90-3, at p. 2 of 5; Tr. at 955, 1016, 1031, 1099-1100).

Six inmates testified during the hearing – Defendant Tellis T. Williams, Philip Santiago, William Trotter, William Anthony Mayes, Tony Ridley, and Jonathan Stone. They all testified that they were not provided enough food to sustain an adult male, and are perpetually hungry. (Tr. at 9, 10-11, 53, 133, 154-55, 160, 166, 187, 189-97, 223-24, 227-28, 233, 288, 292-301, 325-26). Although the inmates were moved to a new building in July, 2009, they testified that they still do not get adequate portions of food. (Id.) Several of these witnesses testified that they had lost weight while at the RCDF, with the most significant weight loss experienced by those

4

inmates with the longest tenure at the Jail.[3] For example, Inmate Stone has lost approximately 100 pounds in the 19 months he has been incarcerated at RCDF, and Inmate Mayes has lost approximately 38 pounds in the eight months he has been at the Jail. Although Defendant Williams' weight loss has not been as dramatic, Ms. Jane Greene, a clinical dietician at Vanderbilt Medical Center, testified that the Defendant is currently underweight: "If that person came into my hospital, I would be concerned that he was underweight and would need some type of *nutrition intervention* to improve his nutritional status." (Tr. at 540).[4]

The Government contends that the Jail records contradict most of the claims of weight

---

[3] Defendant Williams testified that he is six feet, three inches tall, and weighed approximately 165 pounds when he arrived at the RCDF on April 17, 2009. (Tr. at 4-5). The Government disputes Mr. Williams' estimate, but has offered no other record indicating his actual weight on the date he arrived at the Jail. Mr. Williams was weighed in the courtroom during the hearing while wearing shackles, and counsel for the Government and the Defendant indicated the Defendant's weight was 148-149 pounds. (Tr. at 29).

Inmate Santiago testified that he weighed approximately 198 pounds when he arrived at the RCDF on December 5, 2008. (Tr. at 128-29, 143). Although he was not weighed in court, RCDF records indicate that Mr. Santiago weighed 171 pounds on September 3, 2009. (Government's Exhibit 11, at p. 39).

Inmate Trotter testified that he weighed approximately 190 pounds when he arrived at the RCDF approximately nine months prior to the hearing. (Tr. at 160, 183-85, 214-16). Mr. Trotter was weighed in the courtroom during the hearing while wearing shackles, and counsel for the Government and the Defendant indicated that his weight was 164 pounds. (Tr. at 200-01).

Inmate Mayes testified that he weighed approximately 200 pounds when he arrived at the RCDF in January, 2009. (Tr. at 222-23). Mr. Mayes was weighed in the courtroom during the hearing while wearing shackles, and counsel for the Government and the Defendant indicated his weight was 162-163 pounds. (Tr. at 254).

Inmate Stone testified that he weighed approximately 252 pounds when he arrived at the RCDF on February 25, 2008. (Tr. at 283-84, 287-88, 289, 321). Mr. Stone was weighed in the courtroom during the hearing while wearing shackles, and counsel for the Government and the Defendant indicated his weight was 153 pounds. (Tr. at 290).

Inmate Ridley was weighed in court during the hearing, and the weight recorded did not indicate that he lost any weight while at the RCDF.

[4] Even the Government's expert testified that the Defendant was in the lower limits of a healthy weight range. (Tr. at 812-15).

5

loss by the inmates. The Government admits, however, that until recently, the policy of the Jail was to weigh inmates only after they had been at the Jail for two weeks, and that there was no clear policy as to whether the inmate would be weighed while wearing handcuffs and/or shackles. (Tr. at 644-45, 660-61, 671, 695, 715-16, 720). The Government must bear the consequences of failing to provide admissible contrary evidence to the testimony given by the inmates as to their estimated weight when they first arrived at the Jail. The Court notes, however, that even the Jail's records confirm the weight loss of Inmates Stone, Trotter and Santiago. (Government's Proposed Findings and Conclusions, at 14 (Docket No. 91-1)). Furthermore, several of the Government's own witnesses testified that they were aware of weight loss by certain inmates. (Tr. at 351-52 (Officer Jason Broadway); Tr. at 430-32 (Officer Cortez Butler); Tr. at 639-40, 663, 665-66, 677-79 (Nurse Brandon Smith); Tr. at 718, 806, 810, 821 (Nurse Susan Reece)).[5]

In addition, the undersigned and other judges in this District have received complaints and documented weight loss by other inmates housed at the RCDF over the last several years. See United States v. Solathus Johnson, No. 3:07-00171 (Docket Nos. 1356, 1368, 1508); United States v. Deshay Jones, 3:07-171 (Docket Nos. 1401, 1459, 1488); United States v. Demetrius T. Jones, 3:07-00105 (Docket No. 87); United States v. Frederick DeWayne Gross, 3:09-00071.[6]

---

[5] As the Court advised the parties at the hearing, the testimony of Nurse Reece regarding the weight loss of inmates (Tr. at 718) appears to conflict with the testimony she gave at another hearing before this Court in which she stated that she had not seen anyone at RCDF lose more than five pounds (United States v. Padilla-Ochoa, No. 3:09-00072). (Tr. at 781-83).

[6] The Court is aware that inmates may have a motive to exaggerate their complaints and that prior convictions can be used to impeach their credibility. Fed. R. Evid. 609. However, the nutrition claims of the inmates are generally corroborated by their physical loss of weight.

6

Although the Government contends that any weight loss experienced by inmates is "healthy" weight loss, the Court is not persuaded that a mandatory weight reduction plan for overweight inmates is a legitimate penalogical objective for the Jail. Moreover, the Jail staff referenced no plan for stopping the weight loss once the "healthy" weight is achieved to ensure that it does not become what even they would consider "unhealthy." More specifically, the Jail proposed no plan for future oversight or for taking corrective action to ensure that the Defendant receives the nutritional intervention that Ms. Greene has opined is necessary.

The Government contends that inmates are receiving at least 2700 calories per day, which they argue is sufficient to sustain an adult male. The ABL dietician who creates the menu for RCDF, Babette Lanius, testified that she obtains calorie counts by running the menu through a computer program that produces calorie and certain nutritional counts for the food listed. (Tr. at 784). According to Ms. Lanius, the calorie count for the menu she has created for the Jail exceeds the 2700 calories a day required by regulation in the State of Tennessee. (Tr. at 770, 823).[7] The testimony of Ms. Greene, however, calls into question the calorie and other nutritional values assigned to menu items by the ABL computer program. (Tr. at 497-99, 511, 515, 519). Ms. Greene testified that certain meals listed on the menu would not be enough to sustain an adult male. (Tr. at 506, 507, 512).[8] Ms. Greene also expressed concern as to the

---

[7] Ms. Lanius did not address the reliability of the computer program or whether it is reasonably relied upon by expert dieticians. Ms. Lanius also testified that she eliminated hot lunches and fruit at the request of the Jail rather than for reasons of nutrition.

[8] For example, Ms. Greene testified that the lunch menu was not enough to sustain an adult male: "Maybe this much for a child, but grown men, one ounce of meat and a half a slice of cheese with a little peanut butter and jelly, no, sir." (Tr. at 506). Ms. Greene also testified that the standard portion sizes of the turkey and ham at dinner would be the size "I would recommend for a female trying to lose weight. . . " (Tr. at 507). Ms. Greene also opined that the breakfast

7

complete lack of fruit on the menu given that the United States Department of Agriculture recommends five servings of fruits and vegetables per day. (Tr. at 501-03).[9] The Court credits the testimony of Ms. Greene.

Even assuming that the ABL menu provides sufficient nutrition, however, Ms. Lanius, who does not work at the facility, could provide little assurance that food is actually made according to recipe, or that the portions actually served are those set forth on the menu. (Tr. at 843). The Government called the ABL employee on site, Ann Henderson, to testify that she prepares meals based on the menus and recipes provided by ABL, and serves the amounts listed. (Tr. at 883, 884-87, 893, 931, 942).[10] Balanced against that testimony is the testimony of the inmate witnesses who testified that they were rarely served the entire amount of food listed on the menu. (Tr. at 61-66, 67-72). Aside from Ms. Henderson, who had been at the RCDF for three months at the time of the hearing, the Government did not call any witnesses to testify that the amounts actually served were the same amounts listed on the menus.

Captain Jerrell Jones, who has been in charge of the Jail since 1988, expressed little

---

menu was a small amount for a young male. (Tr. at 512).

[9] The Government's arguments for not serving fruit are unconvincing. Even if fruit can be used as a "weapon" or to clog toilets, fruit can be served in a manner to avoid these problems. The lack of fruit in the diets of the inmates at the Robertson County Jail is of continuing concern to the Court.

[10] Ms. Henderson's other statements, however, suggest that variations do occur. For example, Ms. Henderson testified that the turkey and rice casserole recipe was altered, but there is no indication that the altered recipe was analyzed by Ms. Lanius to determine whether the nutritional values had changed. (Tr. at 931-32, 942). In addition, Ms. Henderson seemed to indicate that entrees are measured with the liquid measure "scoops," though Ms. Lanius emphasized that entrees had to be measured by weight. (Tr. at 778, 783, 859, 874, 885, 904-06). Though these discrepancies may appear to be trivial, they may take on greater significance in light of the minimal amount of food to which inmates have access.

8

concern with the weight loss issue and little interest in investigating the reasons for the weight loss or in devising a plan to ensure it does not continue. Captain Jones testified that he leaves the menu and food issues to ABL. (Tr. at 1092-93). In that regard, Ms. Henderson testified that she had heard, from other inmates, about certain inmates experiencing weight loss, but she did not "pay them any attention." (Tr. at 898, 900, 925-26). Ms. Henderson further testified that no one at the Jail had presented her with any complaints, nor had anyone approached her as part of an investigation into the inmates' weight loss. (Tr. at 947-50). This lack of investigation is objectively unreasonable and indicates that the existence of a grievance procedure at the Jail, as described by Captain Jones, provides little assurance that any food and nutrition issues will be resolved by the Jail staff.

In general, Captain Jones seemed unfamiliar with much of the day-to-day details of running the jail. Indeed, Captain Jones testified that he was unaware of a federal court injunction issued in 1993 mandating changes in certain conditions at the Jail. (Tr. at 1015). Although the Court is not required to find deliberate indifference on the part of the Jail staff to order the transfer of the Defendant, Captain Jones' testimony would support such a finding. Indeed, the custom, policy and practice of the Robertson County Jail is that there is not a nutrition problem and, thus, there is no plan to fix it.

The Government also appears to argue that the Defendant's complaints are unfounded because the Jail is certified by the Tennessee Corrections Institute ("TCI"). In that regard, the Court heard the testimony of jail inspector John Hanna, Jr., who has inspected the RCDF for the

9

past 15-16 years. (Tr. at 556, 572).[11] TCI's minimum standards for a jail facility like the RCDF require a menu approved by a licensed dietitian, and that prisoners receive at least two meals every 24 hours, with no more than 14 hours between any two meals. (Tr. at 547-48). Aside from assuring that these minimum standards are met, Mr. Hanna indicated that TCI does not get actively involved in overseeing the functioning of jail facilities. Mr. Hanna indicated that he "just let[s] the jail take care of" the food service if it is contracted out to a third party and the menu is approved by a licensed dietitian. (Tr. at 577, 582). He said that he does not need to speak with the dietitian, but that the only thing he does is look for the dietitian's signature on the meal plan. (Tr. at 583-84).  If there are complaints about the food, Mr. Hanna testified that he would talk to the jail administration about it but that "we would like to think that they have got the amount of integrity that they are telling us exactly what's going on, and they are taking care of the problem, if there is a problem." (Tr. at 577, 600).  Mr. Hanna testified that he had not eaten the food at the Jail because "I have got other things that I need to do, so I don't stay and eat food." (Tr. at 580, 581).  He also testified that he does not look at the quantity of the food served to inmates. (Tr. at 580-81, 599, 616).  According to Mr. Hanna, TCI simply does not have the manpower required to monitor jails more closely. (Tr. at 592, 595).

Having considered the evidence and arguments presented by the Defendant and the Government, the Court concludes that Defendant Williams has not been provided with adequate food and nutrition at the RCDF and will not be provided with it in the future.  Although the Government presented a considerable amount of evidence to rebut the claims of the inmates,

---

[11] Mr. Hanna testified that the inspections take place once a year and last for approximately two and one-half hours, and that he wears a black cotton shirt during the inspections to avoid having jail odors stick to his clothing. (Tr. at 571, 605-06, 619, 630).

10

significant weight loss on the part of certain inmates is unrebutted. Without any testimony or evidence indicating that the RCDF has a plan in place to ensure the curtailment of future weight loss by inmates, the Court must exercise its supervisory authority over the detention of Defendant Williams and order that the Defendant be transferred to another detention facility to ensure that he does not experience any further weight loss. The Court is not persuaded that the other relief requested by the Defendant is warranted at this time or is otherwise moot.

IV. Conclusion

The Defendant's request for relief regarding the conditions of confinement at the RCDF is granted in part, and denied in part for the reasons stated above. The United States Marshals Service is hereby ordered to transfer Defendant Williams forthwith to a place of confinement other than the Robertson County Jail.

It is so ORDERED.

*Todd Campbell*
TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE